COMMISSIONER OF BANKS *vs.* COSMOPOLITAN TRUST COMPANY & others.

Suffolk. May 18, 1925. — July 1, 1925.

Present: RUGG, C.J., BRALEY, PIERCE, WAIT, & SANDERSON, JJ.

*Trust Company,* In liquidation, Stockholders' liability, Validity of votes at meeting of stockholders, Increase of stock, Estoppel of stockholder to deny relation, Subscription to stock procured by fraud, Transfer of stock. *Corporation,* Officers and agents, Records. *Practice, Civil,* Demand on execution. *Equity Pleading and Practice,* Reservation; Master: findings of fact, inferences of fact, exceptions to report; Parties; Decree. *Evidence,* Materiality, Best evidence. *Estoppel. Contract,* Validity. *Limitations, Statute of. Executor and Administrator. Gift. Interest.*

Twenty months after the commissioner of banks, under St. 1908, c. 590, St. 1910, c. 399, took possession of the property and business of a trust company and began liquidating its affairs, he caused demand by virtue of an execution issued upon a judgment recovered against the trust company to be made upon one described by the officer making the demand in his return of service as "its assistant secretary and officer in charge of its business." The by-laws of the trust company made no

provision for the office of assistant secretary but the directors had elected such an officer, established the salary and prescribed important executive duties to the office, and the person so elected had acted as private secretary to the president of the trust company at a time two months before the officer made demand. *Held*, that it could not be said that the demand was not sufficient to form the foundation for a suit to enforce the statutory liability of the stockholders under G. L. c. 172, § 24.

In a suit under G. L. c. 172, § 24, by the commissioner of banks to enforce the statutory stockholders' liability, the defendants contended that the stock they held never legally had been issued because it was not voted by a majority of the stockholders. A master who heard the suit found that, without the use of certain proxies which were present and on the president's desk at a duly summoned meeting of the stockholders, there was not a majority vote. The secretary's record of the meeting, which had not been approved at any subsequent meeting, stated that the votes passed were "voted unanimously" and that the proxies in question were "held but not used." An attorney took to the bank commissioner certified copies of the records of the meetings of the stockholders and of the directors, together with a letter from the president of the trust company reciting the fact of the voted increase of capital stock, saying that it was practically all subscribed for and requesting the requisite approval, and the commissioner, by word of mouth only, conveyed his approval to the attorney. No certificate of the increase of capital stock was submitted to the commissioner or filed with the Secretary of the Commonwealth as required by the statutes. The master stated, "I cannot state positively from the records and the evidence before me that there was any affirmative proof from which I could find definitely that a majority voted except from the inference above made by me," and found as an inference "that the proxies were probably used, and that the president voted on the proxies and had the right to do so," basing his inference upon the fact, which he also found, that the president of the trust company had been advised by counsel that a majority vote of the stockholders was necessary, that the number of proxies required to make a majority were on the desk in front of the president, that the words "voted unanimously" preceded each vote on the record, and that the commissioner of banks approved the issue. The suit was reserved for determination by this court. *Held*, that

(1) It appearing that the evidence and main facts were reported, it was for this court to determine if the inference drawn by the master ought to be drawn therefrom;

(2) The master's inference to the effect that the proxies were voted at the stockholders' meeting was not warranted on the facts and evidence reported;

(3) Certain questions asked of the secretary of the trust company without an offer of proof could not be said to have been excluded improperly by the master, and exceptions to such exclusion were not sustained;

(4) Ordinarily the records of a corporation regularly kept by its proper officer constitute evidence of proceedings at a meeting of its stockholders;

(5) In the circumstances, approval by the commissioner of corporations could not make legal that which otherwise was defective;

(6) All the extraneous facts were insufficient to overcome the clear and indubitable corporate record that the proxies were not used.

*It was stated*, that the court did not decide whether records of a meeting of a business corporation recorded by its recording officer ever can be contradicted collaterally.

Where the name of an individual appears on the stock book of a corporation as a stockholder, the *prima facie* presumption is that he is the owner of the stock; and, in an action against him as a stockholder, the burden of proving that he is not a stockholder, or of rebutting that presumption, is cast upon the defendant.

The rule, that, when a corporation is absolutely without power to increase its capital stock, acquiescence by one receiving shares in such issue cannot give validity to shares or bind an apparent holder of such stock to the liabilities of a genuine stockholder, did not apply in the circumstances of the suit above described where the corporation had power to issue shares although not in the manner in which, or upon the terms upon which, they had been issued.

In a suit by the commissioner of banks under G. L. c. 172, § 24, against the stockholders of an insolvent trust company, whose affairs he was liquidating, those who have subscribed for an increase of stock within the power of the corporation to make, who have received and accepted certificates of stock issued to them and whose names thus have been entered on the books of the corporation as stockholders, who have collected and kept dividends on such stock, and who have acted as stockholders directly or indirectly in the management of the corporation, will not be heard to defeat such an action on the ground that the stock was increased in an irregular or unlawful manner.

*Whether*, in the circumstances of the suit above described, the oral approval of the increase of capital stock by the commissioner of banks was sufficient under all conditions to constitute compliance with the provisions of G. L. c. 172, § 18, and c. 66, § 6, it was not necessary to decide.

The fact, that some of the defendants in the suit above described were induced to become subscribers to the increase of capital stock through the fraudulent representations of the president of the trust company, was *held* not a defence, where it appeared that they did not exercise their rights to avoid the contract until the rights of creditors had intervened by reason of the insolvency of the trust company.

A by-law of the trust company in the suit above described was to the effect that the shares could not be sold without first being offered to the board of directors. One of the defendants handed his certificate of stock to the president of the company five months before the commissioner took possession and received from him a check in amount over twice the par value of the shares. Dividends thereafter were paid on the stock by check to the order of the president by his individual name "or" the defendant. It did not appear with whom the defendant made his contract of sale. *Held*, that

(1) The inference was that the sale was made to the president as an individual;

(2) Since there was no transfer of stock on the books of the trust company, the defendant remained liable as a stockholder;

(3) The principle of law that delivery of a certificate to the officers of a bank for transfer, where the original holder has done all he can to divest himself of the indicia of title and where the failure to issue the new certificate in the name of the new owner is wholly the fault of the bank or its officer, exonerates the original owner in case of a genuine sale, did not apply, the delivery by the defendant in question not being to the bank or to its officer for the purpose of transfer.

The mere fact, that in violation of G. L. c. 172, § 18, payment for some of the stock issued in the circumstances above described was by note and not in cash, was not a defence in the suit against the holders of such stock.

Findings by the master that one defendant never purchased nor subscribed for the shares, never knew of the existence of the certificate in her name, and never received dividends, exonerated her from liability as a stockholder.

The short statute of limitations was *held* to bar the maintenance of the suit above described against the administrator of the estate of a stockholder who had died since the commissioner took possession, the primary claim being against the stockholder personally and not directly and originally against his estate.

In the suit above described, the mere fact that certain stockholders received their certificates as gifts, even though in one instance for the benefit of some one else, was *held* not to constitute a defence.

In the suit above described one defendant was a nonresident and was not served upon, although property of his was attached, and it was *held*, that no general decree could be entered against him, but that he might be adjudged a stockholder and his liability established as such, to be enforced only out of the property attached.

The amount due from each defendant in the suit above described bore interest from the date of the notice by the commissioner to each defendant.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on March 22, 1923, and afterwards amended, by the commissioner of banks in possession of the property and business of the Cosmopolitan Trust Company against that trust company and sundry stockholders or their personal representatives, praying that the defendants severally be assessed sums in proportion to the amount of stock held by them or their decedents, respectively, at the time of taking possession by the commissioner, that "the amount so to be assessed . . . be the amount of their stock in said trust company at par value thereof in addition to the amount invested in said shares"; that the defendants be severally ordered to pay the amount for which they may be found liable to the plaintiff, and for further relief.

The suit was referred to a master. Material findings by the master and exceptions to his original and supplemental report are described in the opinion. The suit was reserved by *Braley,* J., "upon the pleadings, the master's original and supplemental reports, and the exceptions thereto, for determination by the full court."

*D. L. Smith & R. W. Nason,* (*H. O. Cushman* with him,) for commissioner of banks.

*H. Williams, Jr.,* (*F. O. White* with him,) for the defendant Bittenbender.

*P. A. Atherton,* for the defendants Ulin and others.

*A. M. Beale,* for the defendants Vorenberg.

*S. L. Bailen,* for the defendants Dana and another.

*J. A. Sullivan* (*J. M. Maloney* with him,) for the defendants Keliher and others.

*M. M. Horblit,* (*J. Wasserman* with him,) for the defendants Anthony and others.

*H. A. Wilson,* for the defendant Whitney, submitted a brief.

*J. Nelson,* for the defendants Grandberg and others; *John R. Murphy,* for the defendant O'Riordan; *A. Hurwitz & S. Hurwitz,* for the defendants Holzman and others; and *A. B. Lourie,* for the defendant Cohen, submitted the case without argument upon the arguments and briefs of the other parties defendant.

*L. A. Mayberry* and *E. Greenhood,* by consent of court, each filed a brief as *amicus curiae.*

RUGG, C.J. This is a suit in equity by the commissioner of banks in possession of the property and business of the Cosmopolitan Trust Company seeking to charge the individual defendants as stockholders of the trust company with liability to the amount of the par value of their shares under G. L. c. 172, § 24. *Commissioner of Banks* v. *Prudential Trust Co.* 242 Mass. 78. *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 247 Mass. 334. The case was referred to a master, whose report deals at length with the issues raised.

Undisputed facts are that the trust company was organized under the laws of this Commonwealth on January 15,

1912, with a capital stock of $200,000. It conducted a general banking business with a savings department until September 25, 1920, when the commissioner of banks took possession of its business and property and has since retained such possession and is liquidating its affairs. G. L. c. 167, § 22. It is hopelessly insolvent.

The preliminary steps prerequisite to the enforcement of the liability of stockholders appear to have been taken. *Cosmopolitan Trust Co.* v. *Cohen*, 244 Mass. 128. *Nichols* v. *Taunton Safe Deposit & Trust Co.* 203 Mass. 551. The only point seriously argued in this connection is that there was no proper demand on the execution issued upon the judgment recovered against the trust company. G. L. c. 158, § 46. It is provided by G. L. c. 223, § 37, that service of process upon a domestic corporation " shall be made upon the clerk, cashier, secretary, agent or other officer in charge of its business . . . ." Demand on the execution was made on March 28, 1922, according to the return on May 3, 1922, by the officer, on one "Goldie, its Assistant Secretary, and officer in charge of its business." It appears that the by-laws of the trust company made no provision for the office of assistant secretary but that the directors had elected such an officer, established the salary and prescribed important executive duties of the office, and that the person so elected acted as private secretary to the president of the trust company on March 28, 1922. In view of these facts and the further consideration that the trust company had been in the hands of the commissioner of banks for liquidation for more than twenty months, it cannot be said that the demand was not sufficient. *Harriman* v. *Reading & Lowell Street Railway*, 173 Mass. 28, 38.

No question is made concerning the original issue of stock or the liability of its holders under G. L. c. 172, § 24. The validity of the so-called second issue of capital stock is contested. That issue of stock was, as alleged, an increase of capital stock of $400,000, from $200,000 to $600,000. The trust company was authorized by the statute to increase its capital stock "by the vote of a majority of all its stock." St. 1916, c. 37, see now G. L. c. 172, § 18; c. 156, § 41. The

relevant facts as to that increase of capital stock are that a special meeting of the stockholders was held on June 16, 1919, to take action with reference to increasing the capital stock of the company. The master found that the notices for this meeting were duly mailed to all the stockholders. The subsidiary facts reported justify this finding. *Prudential Trust Co.* v. *Hayes*, 247 Mass. 311. The special meeting appears to have been legally called and held.

The records of that stockholders' meeting show that eight hundred and sixty-six shares of capital stock were represented by named individuals. Then occurs this sentence: "Proxies of 41 Stockholders representing 360 shares were held but not used." The records also show that a motion to increase the capital stock, subject to the approval of the bank commissioner, "from $200,000 to $600,000 — by the addition of 4,000 shares of stock of a par value of $100 each —," was "voted unanimously." Other motions were adopted authorizing the directors, after approval of the increase of capital stock by the bank commissioner, to sell the additional shares, empowering the officers of the trust company to take all necessary steps to carry out the votes as to increase of capital stock, and directing the officers of the trust company to prepare and file the certificate required by law as to increase of capital stock, all of which were "voted unanimously." The records do not show and the master reports no facts tending to indicate that a stock vote was taken on the motion to increase the capital stock or on any of the other motions. With respect to the proxies and their use for voting, the master reports: "I find as a fact that notices of the meeting of June 16, 1919, were sent out after June 6, 1919. Each notice had attached a blank proxy in the form shown in paragraph 7 of the report. Sometime between June 6 and the date of the meeting, Frank G. Howard, secretary, received forty-one (41) signed proxies. He testified, and I so find, that upon receipt of the forty-one (41) proxies he examined them to see that they were signed, and verified same with the stock ledger of the company, which was in evidence before me; that he marked on each proxy the number of shares held by the person by whom the

proxy purported to be signed, and that he tied them in a bundle and gave them to Max Mitchell. I find that the secretary was present throughout the meeting and kept a record of the same on a sheet of paper. At the close of the meeting he put the sheet of paper, together with the alleged proxies, in his compartment in the safe at the bank. The following day, or the day thereafter, he made up the minutes of the meeting mentioned in the report.

"I find as a fact that the commissioner of banks, his agents and employees, made diligent search among the bank's effects for any proxies for the meeting of June 16 and found none. No evidence was introduced as to the identity of the persons who signed any of the alleged proxies, nor was any evidence introduced by the plaintiff to show whether any person or persons were designated as authorized to vote the alleged proxies, nor was any evidence introduced to show when said alleged proxies were delivered by said stockholders and to whom, except as above stated. I further find that the proxies were not checked at the meeting to ascertain whether the signers were present and voting in person, nor were they examined nor discussed in any way.

"I find that the stockholders' records subsequent to June 16, 1919, do not disclose that the minutes of the meeting of June 16, 1919, were read and approved, and I therefore find that these records were never read and approved."

"From the records it is clear that those present at the meeting, with the exception of Adolf Leve, who was not a stockholder at the time, owned eight hundred and sixty-six (866) shares and that the proxies of forty-one stockholders, representing three hundred and sixty shares, were not used.

"There was no evidence that the proxies authorized any person who was present at the meeting to vote such proxies, nor that any of the proxies were executed within six months of the meeting. No proxies were produced before me in evidence, nor was there any evidence that United States Internal Revenue stamps required by law had been affixed to the same and cancelled prior to the date of said meeting. There was evidence, however, that the proxies were filed with the secretary some time prior to the meeting, that at the

opening of the meeting they were handed by the secretary to the president, and that they remained on the desk in front of the president throughout the meeting.

"Considering that Leve probably represented his wife, Claudine, and the fact that the president was informed by Mr. Friedman [a member of the bar and formerly counsel for and a director of the trust company] that a majority vote of the stockholders was necessary, and that the words 'voted unanimously' appeared before each vote, and finally, that the commissioner of banks approved the issue, as above indicated, I infer, if I have a right so to do from the above evidence, that the proxies were probably used, and that the president voted on the proxies and had the right to do so. I cannot state positively from the records and the evidence before me that there was any affirmative proof from which I could find definitely that a majority voted except from the inference above made by me."

In his supplemental report the master says: "In coming to a conclusion, and in view of the evidence contained in my report and in this supplemental report, I was, and am now, unable to state whether the president voted the proxies handed him by the secretary, except as I infer in my report."

The directors, at a meeting held immediately after the stockholders' meeting, passed appropriate votes for the sale of the additional stock.

The approval by the bank commissioner to which the master refers was, by word of mouth alone, conveyed to an attorney, who, at the request of the president of the trust company, took to the bank commissioner certified copies of the records of the meetings of the stockholders and of the directors, together with a letter from the president of the trust company reciting the fact of the voted increase of capital stock, saying that it was practically all subscribed for and requesting the requisite approval. No record of such approval was made in the office of the commissioner of banks. No further action as to the increase of capital stock was taken by the officers of the trust company. No certificate of the increase of capital stock was submitted to the commissioner or filed with the Secretary of the Commonwealth

as required by St. 1903, c. 437, § 41, and St. 1916, c. 37, now G. L. c. 156, § 43, and c. 172, § 18.

The case comes before us by reservation on the pleadings, the master's original and supplemental reports, and exceptions thereto. Touching the question whether the vote to increase the capital stock was adopted "by the vote of a majority of all its stock" St. 1903, c. 437, § 40, G. L. 156, § 41, the master, after stating the main facts as already quoted, said: "I infer, if I have a right so to do from the above evidence, that the proxies were probably used, and that the president voted on the proxies and had the right to do so." The evidence or the main facts found thus having been reported, this court determines for itself the correct inference which ought to be drawn therefrom. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 333, 334. *American Circular Loom Co.* v. *Wilson,* 198 Mass. 182, 200. *Rioux* v. *Cronin,* 222 Mass. 131, 134. *Forman* v. *Gadouas,* 247 Mass. 207, 210, 211. *Fairbanks* v. *McDonald,* 219 Mass. 291, 297. Without narrating the subsidiary findings in detail, it is enough to say that the forty-one proxies might have been found to have been properly executed and delivered and, although in blank and undated, *Ex parte Duce,* 13 Ch. Div. 429, *In re Election of St. Lawrence Steamboat Co.* 15 Vroom, 529, and lacking United States revenue stamps, *Cole* v. *Ralph,* 252 U. S. 286, to have authorized the president of the trust company to use them in voting upon the stock thereby represented. G. L. c. 156, § 32.

The master's inference to the effect that the proxies were voted at the stockholders' meeting of June 16, 1919, was not warranted on the facts and evidence reported. The records of the meeting kept by the proper officer of the trust company contain the positive and unequivocal statement that the proxies "were held but not used." The master makes no finding that this record was falsified, or altered, or not made in good faith.

The plaintiff's exception to the rejection of questions asked of the secretary as to the manner in which the presiding officer at that meeting put the questions, or how the vote was taken on the motion to increase the stock, or in what

form of words the result of the vote was announced, cannot be sustained. It is doubtful whether these questions were directed to the point of showing that the record as to the proxies was incorrect in fact. However that may be, no offer of proof was made and therefore it cannot be known that the plaintiff was harmed by the exclusion. *Cook* v. *Enterprise Transportation Co.* 197 Mass. 7, 10. *Webb* v. *Lothrop,* 224 Mass. 103, 108. The record of the corporation must stand for what it is worth on this point.

Ordinarily the records of a corporation regularly kept by its proper officer constitute evidence of proceedings at a meeting of its stockholders. It has been said not infrequently that they are the best evidence. *Thayer* v. *Middlesex Mutual Fire Ins. Co.* 10 Pick. 326, 330. *Narragansett Bank* v. *Atlantic Silk Co.* 3 Met. 282, 287. *Gould* v. *Norfolk Lead Co.* 9 Cush. 338, 345. *Stebbins* v. *Merritt,* 10 Cush. 27, 31, 32. *Wallace* v. *First Parish in Townsend,* 109 Mass. 263. *Holden* v. *Hoyt,* 134 Mass. 181, 184.

The present record of the stockholders' meeting bears inherent indication that it was written with care, because there is an entry of the name of one person acting as proxy for a named stockholder. This gives added weight to the statement in the sentence following in the record that proxies of forty-one other stockholders "were held but not used." The secretary of the trust company, who made the record, testified before the master, but he did not say that the record in this particular was inaccurate, mistaken or untrue. He does not appear to have given any testimony throwing doubt upon its reliability or veracity.

The facts upon which the master based his inference that the proxies were voted at the stockholders' meeting in favor of the increase in stock were (1) that the president of the trust company had been advised by counsel that a majority vote of the stockholders was necessary, (2) that the number of proxies required to make a majority were on the desk in front of the president, (3) that the words " voted unanimously " preceded each vote on the record, and (4) that the commissioner of banks approved the issue. It requires no extended discussion to demonstrate that the first three of these facts

are equivocal. Presiding officers do not always in their actions conform to their knowledge. Physical presence of proxies at a stockholders' meeting does not necessarily import their use. The words "voted unanimously" indicate that there were no opposing votes, or that all persons present manifested approval. *Coxon* v. *Trenton*, 49 Vroom, 26. It carries no implication respecting the proxies in view of the precise record that they were not used. The approval by the commissioner of banks of the increase of stock does not signify an affirmative decision in favor of the validity of the vote to make such increase, although doubtless a careful commissioner of banks would examine the record and be satisfied on that point before approving the increase. Approval of an increase of capital stock cannot, in this connection, whatever its other effects may be, make that legal which otherwise is defective. See *Herrick* v. *Waitt*, 224 Mass. 415, 417. *Martin's Case*, 231 Mass. 402. *Boston Bar Association* v. *Casey*, 227 Mass. 46, 51. *Riley* v. *Brusendorff*, 226 Mass. 310, 312. We are not dealing here with the formal certificate and indorsement of approval of regularity of proceedings by the commissioner of banks required by G. L. c. 156, § 43; c. 172, § 18, as to which different implications might arise. *Casey* v. *Galli*, 94 U. S. 673, 679. *Chubb* v. *Upton*, 95 U. S. 665. *McCormick* v. *Market Bank*, 165 U. S. 538, 548. *Bailey* v. *Tillinghast*, 99 Fed. Rep. 801, 808. *Brown* v. *Tillinghast*, 35 C. C. A. 323. *Columbia National Bank of Tacoma* v. *Mathews*, 29 C. C. A. 491, 497. No such certificate and approval was given in the case at bar. But as decided in *Cunningham* v. *Commissioner of Banks*, 249 Mass. 401, 419, 420, that is not fatal to the plaintiff.

Doubtless the general inference in favor of the regularity of corporate proceedings, *Cunningham* v. *Commissioner of Banks*, 249 Mass. 401, 421, would justify the conclusion of the master, if there were no positive record of the corporation that the forty-one proxies were not used. It might be presumed that they were used in order to produce a legal result in the absence of that corporate record. But the corporate record with all implications in its favor is explicit to the point that, although physically present, they were not in fact used.

All the extraneous facts are insufficient to overcome the clear and indubitable corporate record that the proxies were not used.

We do not decide whether such records of a business corporation can ever be contradicted collaterally. See in this connection, as to records of towns, parishes, school districts and similar organizations, *Halleck* v. *Boylston*, 117 Mass. 469, 470, and cases there collected. *Morrison* v. *Lawrence*, 98 Mass. 219, 221. *Stratton* v. *Lowell*, 181 Mass. 511, 513. That rule would seem to be applicable in appropriate instances to the records of a business corporation. *American Tube Works* v. *Boston Machine Co.* 139 Mass. 5, 10. Compare *Amherst Bank* v. *Root*, 2 Met. 522, 540, 544. *Holden* v. *Hoyt*, 134 Mass. 181, 184, *Commonwealth* v. *Reading Savings Bank*, 137 Mass. 431, 438. However that may be, we go no further than to decide that the record in the case at bar must be taken to be true and that the contrary inference drawn by the master was not warranted.

Other factors must be taken into account in reaching a conclusion as to the liability of the defendants. They all subscribed for shares of the increase of capital stock. The master has found that "all of the four thousand shares of the second issue were allotted and certificates delivered to the subscribers therefor, including all the defendants, except those hereinafter specifically mentioned, and paid for by the defendants herein at the rate of one hundred and fifty dollars ($150) per share, or more, before December 15, 1919, by cash or promissory notes, and that such disposition was approved by the directors at a meeting held January 6, 1920, and the name of each subscribing stockholder recorded in the records of that meeting." Subsequent to October 14, 1919, and before September, 1920, the trust company paid four quarterly dividends of $3 per share. Substantially all the defendants received and accepted checks of the trust company for these dividends. Two meetings of stockholders were held in 1920 before the time when the commissioner took possession of the trust company. Most of the defendants signed proxies for one or both of those meetings and mailed them to the trust company. A schedule annexed to the master's report shows

the details as to these matters concerning each defendant. The defendants therefore appeared upon the books of the trust company and by possession of certificates of its stock standing in their names to be shareholders in the trust company. They not only appeared to be stockholders, but they themselves consciously acted like stockholders. They received and held possession of the certificates of stock. They collected the dividends regularly. They or many of them voted directly or by proxy at stockholders' meetings.

"Where the name of an individual appears on the stock-book of a corporation as a stockholder, the *prima facie* presumption is that he is the owner of the stock, in a case where there is nothing to rebut that presumption; and, in an action against him as a stockholder, the burden of proving that he is not a stockholder, or of rebutting that presumption, is cast upon the defendant." *Turnbull* v. *Payson*, 95 U. S. 418, 421. *Lantry* v. *Wallace*, 182 U. S. 536, 550, 551. *Banigan* v. *Bard*, 134 U. S. 291.

The right of the defendants to receive dividends and to execute proxies for use at stockholders' meetings was justifiable solely on the theory that they were stockholders. Acquiescence cannot clothe with legality a positively illegal act. One cannot ordinarily be estopped to assert the direct violation of a decisive prohibition of statute or the unenforceability of a contract contrary to law. When a corporation is absolutely without power to increase its capital stock, acquiescence cannot give validity to shares nor bind an apparent holder of such stock to the liabilities of a genuine stockholder. " 'A distinction must be made between shares which the company had no power to issue and shares which the company had power to issue, although not in the manner in which, or upon the terms upon which, they have been issued. The holders of shares which the company has no power to issue, in truth had nothing at all, and are not contributors.' " *Scovill* v. *Thayer*, 105 U. S. 143, 149.

The trust company in the case at bar had the power to increase its capital stock by conforming to the regulations of the statute. It was not prohibited by any law from making such an increase as is here in question. A meeting of the

stockholders duly called was legally held for the purpose of voting upon the question of increasing the capital stock. Enough shares of stock were represented at that meeting, either by their owners in person, or by proxies which the president might have used, to vote the increase in the capital stock. The conduct of the president as shown upon this record was such that it would naturally have been expected that he would use the proxies to vote for the increase. The increase was in fact approved by the commissioner of banks. There was an attempted increase in the capital stock of the trust company, under the forms of law and approved by the public officer designated by statute for that purpose. Subscriptions for that increase were paid by the defendants, received by the trust company and certificates of stock therefor were issued, dividends were received by the defendants and they participated in the ordinary way in the management of the trust company. The defendants supposed that they were subscribing to an issue of increase of capital stock. They intended so to subscribe. The means were open to them to ascertain all the facts concerning the validity of that issue before becoming subscribers to it. After they assumed the relation of ostensible stockholders, all records of the corporation were or ought to have been open to them for examination to determine the lawfulness of the issue. If they had asked and been refused opportunity for such examination, perhaps different questions might require decision. They were content to accept their apparent relation as stockholders without critical investigation. If the new issue of stock had turned out ultimately to have been a profitable adventure, they would have shared in the benefits. These factors, together with others to which allusion already has been made, are sufficient to bring the case at bar within the second classification made in the quotation from *Scovill* v. *Thayer, supra*. These factors do not constitute "an aggregate of nothings." They show an attempt to do what the trust company had power to do, and a failure to observe all the steps required by law to accomplish that result.

The true rule is, when action is brought in behalf of creditors by the representative of an insolvent financial corpora-

tion, like a bank or trust company organized and conducted for the purpose of soliciting and receiving deposits from the public, to enforce the statutory liability of its stockholders, that those, who have subscribed for an increase of stock within the power of the corporation to make, who have received and accepted certificates of stock issued to them, and whose names thus have been entered on the books of the corporation as stockholders, who have collected and kept dividends on such stock, and who have acted as stockholders directly or indirectly in the management of the corporation, will not be heard to defeat such an action on the ground that the stock was increased in an irregular or unlawful manner.

Strong reasons of policy support this rule. The public must depend to a large extent upon the confidence in the integrity of management and the financial soundness of banks and trust companies resting upon true capital stock. Those who avowedly assume the relation of stockholders to such institutions in a sense stand sponsor for it. Public confidence in such institutions ought not to be shaken by relieving apparent stockholders from their ostensible liability established by the law for the benefit of creditors for any except the most potent and convincing reasons. This trust company conducted not only the usual banking business of deposit and discount, but had a savings department. Depositors in savings departments are given special preferences under the law. The Legislature endeavored by the statutes to place such depositors as nearly as possible upon the same footing as depositors in savings banks, although of necessity there were differences arising out of the greater risk incident to conducting general banking by trust companies. *Commissioner of Banks in re Prudential Trust Co.* 240 Mass. 478. Persons who profess and intend to become stockholders in an institution which invites deposits of the scanty savings of the poor and thrifty must do it with reference to the safeguards established for the protection of such depositors. In some aspects such parties do not stand quite at arms length with reference to each other. Principles which might be invoked with reference to purely business transactions are less pertinent when the question is raised in behalf of such

depositors. They are not only third persons, whose rights have intervened, but they are persons whose deposits constitute a trust fund, entitled to all the safeguards which the law and the statutes throw about such a fund. Stockholders' liability by the express terms of G. L. c. 172, § 63, is a special security for the benefit of savings depositors. *Commissioner of Banks in re Prudential Trust Co.* 244 Mass. 64, 70, 71, 72. The question as to the liability of the defendants as stockholders is not raised by the corporation, or by public officers enforcing regularity of corporate conduct, or by other stockholders. It is not raised on their own initiative in proceedings against a going concern directly instituted to relieve themselves of a fraud practised on them. It is presented after the insolvency of that concern as a defence in an action to enforce a liability in behalf of beneficiaries for whom the General Court has undertaken to establish an exceptional protection.

The defendants, in becoming subscribers to the stock of the trust company, must be presumed to know the common customs of business touching such a matter. The executive officers of such a company would naturally spread the information by conspicuous and widely known means that its financial resources and responsibility had been enlarged by such increase of capital stock. Whether they did in fact need not be inquired. The public would be likely to rely upon notorious and unchallenged statements in giving credit to the institution on the faith of its larger assets. Inducement of particular individuals to become creditors of the trust company on the strength of such increase hardly could be shown by specific testimony. No direct evidence commonly would be required to the point that people would trust an association with $600,000 of paid up capital rather than one with $200,000 if other factors of credit were the same. The circumstance that the public records did not disclose the increase of capital stock in this connection is not of decisive significance. Although the doctrine of estoppel is not overmuch favored by the law, *Boston & Albany Railroad* v. *Reardon*, 226 Mass. 286, 291, yet, when the representative of creditors is asserting a statutory liability, its

essential elements may be found to be present as against stockholders who intentionally join in an apparent increase of capital of a trust company. The principle declared in *Scott* v. *Deweese*, 181 U. S. 202, an action to enforce the liability of a stockholder in a national bank who defended on the ground that all the increase had not been paid in as required by the national bank act, is peculiarly applicable to the case at bar. Some of the language used in that decision is equally pertinent to the facts here disclosed. We adopt it as expressing the controlling rule of law. Here, as there, the statute does not in terms make void the stock based upon increased capital actually paid in. It there was said, beginning at page 210: "Certainly, the statute should not be so applied in behalf of a person sought to be made liable as a shareholder, when, as, in the present case, he held, at the time the bank suspended and was put into the hands of a receiver, a certificate of the shares subscribed for by him; enjoyed, by receiving and retaining dividends, the rights of a shareholder; and appeared as a shareholder upon the books of the bank . . . . [212] The defendant, having paid in the amount subscribed, subsequently accepted a certificate for the shares subscribed for by him, knowing, as he must be conclusively presumed to have known, that the money paid in by him was the basis of such certificate. He assumed the position, and claimed and exercised the rights, of a shareholder. He drew money from the bank as dividends upon his stock. . . . [213] immediately upon the failure of the bank the rights of creditors attached . . . , and a shareholder who was such when the failure occurred could not escape the individual liability prescribed by that section upon the ground that the bank had issued to him a certificate of stock before, strictly speaking, it had authority to do so. . . . The present suit is primarily in the interest of creditors of the bank. It is based upon a statute designed not only for their protection but to give confidence to all dealing with national banks in respect of their contracts, debts and engagements, as well as to stockholders generally. If the subscriber became a shareholder in consequence of frauds practised upon him by others, whether they be officers

of the bank or officers of the Government, he must look to them for such redress as the law authorizes, and is estopped, as against creditors, to deny that he is a shareholder, . . . if at the time the rights of creditors accrued he occupied and was accorded the rights appertaining to that position." This statement is supported directly or by strong inference by other decisions. *Cunningham* v. *Commissioner of Banks,* 249 Mass. 401, 420, 421. *Chester Glass Co.* v. *Dewey,* 16 Mass. 94, 101. *Bearse* v. *Mabie,* 198 Mass. 451, 456. *Handley* v. *Stutz,* 139 U. S. 417. *Chubb* v. *Upton,* 95 U. S. 665. *Lantry* v. *Wallace,* 182 U. S. 536. *Banigan* v. *Bard,* 134 U. S. 291. *Wallace* v. *Hood,* 89 Fed. Rep. 11, affirmed in *Hood* v. *Wallace,* 182 U. S. 555. *Peck* v. *Elliott,* 79 Fed. Rep. 10, 18. *Columbia National Bank of Tacoma* v. *Mathews,* 29 C. C. A. 491, 498. *Aspinwall* v. *Butler,* 133 U. S. 595. *Delano* v. *Butler,* 118 U. S. 634. *Veeder* v. *Mudgett,* 95 N. Y. 295, 310, 311. *Jeffery* v. *Selwyn,* 220 N. Y. 77. *Challis's Case,* L. R. 6 Ch. 266. *In re Miller's Dale & Ashwood Dale Line Co.* 31 Ch. D. 211. See Cook on Corporations, (8th ed.) 966, § 288.

It is earnestly contended by the defendants that the case at bar is controlled by *American Tube Works* v. *Boston Machine Co.* 139 Mass. 5. That case arose by the plaintiff offering for proof its claim against the estate of the defendant after it had gone into insolvency. That claim was for money paid for the peculiar kind of stock known as special stock. The characteristics of that stock were, as stated in the opinion, that it was limited in amount, subject to redemption after a defined time, and entitled to fixed dividend as upon a debt; and further, "the holders of it are in no event liable for the debts of the corporation beyond their stock; and the issue of special stock makes all the general stockholders liable for all debts and contracts of the corporation until the special stock is fully redeemed." Obviously, the holders of special stock under that law were of limited powers and obligations, resembling creditors in many particulars; and the existence of such stock had a vital effect upon the liabilities of general stockholders by rendering them directly responsible without restriction for all debts and contracts of the corporation.

The facts with respect to the special stock in that case were that a meeting of stockholders was called to consider the issuance of "preferred stock," a kind of stock different in essential distinctions from "special stock," and a vote to that effect was held invalid. Attempts to ratify the original vote at two subsequent meetings of stockholders were ineffective because the votes were not passed by the requisite three-fourths of its general stockholders. The only parties to that controversy were the plaintiff, who was the subscriber to the supposed special stock, and the defendant, the corporation which had undertaken to issue it. They alone had an interest in the outcome of the controversy, except the more or less attenuated one that proof of the claim by the plaintiff might reduce the dividend to be paid to the other creditors in insolvency of the defendant. It was with reference to those unusual facts that it was held that issue of the special stock was invalid, that the plaintiff might rescind its contract to take "special stock" and that it was not bound by any estoppel. The language expressive of that decision was employed concerning the facts then before the court and cannot rightly be extended to circumstances not then under consideration and investigation. *Swan* v. *Justices of the Superior Court*, 222 Mass. 542, 545. Moreover, that was not a case involving stockholders' liability because a special stockholder was in no event chargeable with any such liability. It there was stated expressly that "No rights of third parties have intervened." Here the rights of creditors are primarily considered, many of whom may have become such since the issuance of shares of stock to the defendants. The American Tube Works case was followed without discussion in *Reed* v. *Boston Machine Co.* 141 Mass. 454, a precisely similar case with reference to the same kind of "special stock" in the same corporation. Without doubting in any particular the authority of those two decisions, the facts already narrated are sufficient to distinguish the case at bar from them.

The case at bar also is distinguishable from *Attorney General* v. *Massachusetts Pipe Line Gas Co.* 179 Mass. 15, which related to the interpretation of tax laws, where doubts

are resolved in favor of the taxpayer and where no question of liability to general creditors was under discussion. The case at bar is distinguishable from so called public service corporations like gas, electric light and street railway corporations, which under the restrictive statutes of this Commonwealth neither have "nor can have, a capital stock or any part of a capital stock, until an issue is authorized by the board having jurisdiction in the premises." *Falmouth* v. *Falmouth Water Co.* 180 Mass. 325, 330. See, for example, G. L. c. 161, §§ 9, 28, 31; c. 164, § 14; c. 165, § 2.

It is not necessary to decide whether the oral approval of the increase of capital stock by the commissioner of banks was sufficient under all conditions to constitute compliance with the provisions of G. L. c. 172, § 18, and c. 66, § 6. Actual approval by that officer has been found by the master. That finding cannot be pronounced wrong. It must stand. If a more formal approval be required in some connections, even then such approval is on the same footing on this record as the failure to file the articles of amendment showing increase of capital stock and to secure approval of formal certificate of increase of capital stock by the commissioner of banks. Nonconformity to these requirements of the law cannot now avail these defendants as a bar to the present suit. This is covered by the authority of *Cunningham* v. *Commissioner of Banks,* 249 Mass. 401, 420–422, and need not be discussed further.

It follows that the defendants are here precluded from setting up the defence that they are not stockholders by reason of nonconformity to the law in making the increase of capital stock.

The master has made explicit findings to the effect that several of the defendants were induced to become subscribers to the increase of capital stock through the fraudulent representations of the president of the trust company. The deceit thus practised appears on this record in numerous instances to have been peculiarly faithless and reprehensible. Nevertheless, we think it plain on principle and on authority that such a defence cannot prevail under the circumstances here disclosed. The subscriptions of these defendants for

stock was a contract. It is fundamental in the law of contracts that an agreement induced by fraud is voidable and not void. The injured party, after discovering the fraud practised on him, has the election to avoid the contract, or to abide by it. The right to avoid such a contract must be exercised before the rights of third parties have intervened. The subscriptions for stock doubtless might have been avoided by the defendants if the trust company had continued as a going concern. But the rights of creditors have intervened by reason of the insolvency of the trust company. The commissioner of banks as their representative has a right to enforce the statutory liability of stockholders. The intervention of that factor prevents the stockholders from exercising their right of rescission and avoidance of their contracts of subscription for stock. They are remanded to whatever rights they may have against those who deceived them. Although this precise question has not arisen hitherto in this Commonwealth, the authorities elsewhere are numerous and convincingly persuasive. *Scott* v. *Deweese,* 181 U. S. 202. *Oakes* v. *Turquand,* L. R. 2 H. L. 325, 345, 348, 361, 362, 375. *Houldsworth* v. *City of Glasgow Bank,* 5 App. Cas. 317. *Alsop* v. *Conway,* 188 Fed. Rep. 568, 576, 577. *Ryan* v. *Mount Vernon National Bank,* 224 Fed. Rep. 429. *Upton* v. *Tribilcock,* 91 U. S. 45. *Chubb* v. *Upton,* 95 U. S. 665, 667, and cases there cited. *Wallace* v. *Hood,* 89 Fed. Rep. 11, affirmed in *Hood* v. *Wallace,* 182 U. S. 555. The remedies which may be open to the defendants for the misrepresentations practised upon them are not here presented for decision. It is enough to say that no defence to the present suit is set forth in the findings of the master as to the fraud practised on the defendants.

Certain of the defendants took such active part in promoting the increase in capital stock that they might perhaps be held on special grounds. But it is not necessary to discuss those aspects of the case, because of the broader grounds on which this decision rests.

It remains to consider special defences put forward in behalf of individual defendants.

The facts with reference to Samuel E. Berman are that according to the records of the trust company he was the owner of twenty shares of stock represented by a single certificate. Berman testified that in April, 1920, he handed to the president of the bank the certificate and received a check of the Cosmopolitan Trust Company for $4,200, and thereafter received no dividends and no notices of meetings. The dividend checks for May and August, 1920, were made payable to "Max Mitchell or Samuel E. Berman" and were credited to the account of the former. There was printed on the back of the certificate an extract from a by-law of the trust company to the effect that the shares could not be sold without first being offered to the board of directors. There was no compliance with this by-law on the part of Berman. The report does not show in terms with whom the contract of sale was made by Berman. The trust company had no power to buy or hold this stock. G. L. c. 172, § 39. The retention of subsequent dividends by Mitchell indicates that he was the purchaser. The inference is that the sale and delivery of the stock was to him as an individual. Since there was no transfer of the stock on the books of the trust company, Berman remained liable as stockholder. *Richmond* v. *Irons*, 121 U. S. 27, 58, 59. *Matteson* v. *Dent*, 176 U. S. 521, 530. *Whitney* v. *Butler*, 118 U. S. 655. *King's Case*, L. R. 6 Ch. 196. Delivery of a certificate to the officers of a bank for transfer, where the original holder has done all he can to divest himself of the indicia of title, and where the failure to issue the new certificate in the name of the new owner is wholly the fault of the bank or its officers, has been held to exonerate the original owner in case of a genuine sale. That principle has no application to the facts here disclosed. The delivery by Berman was not to the bank or its officers for the purpose of transfer.

It appears that the defendant Bittenbender was not an original stockholder in the trust company. He paid $200 per share for some of his shares of the increase of capital stock, that being the price fixed to the general public by vote of the board of directors of the trust company. That circumstance does not place him on any footing different

from those who, being original stockholders, paid $150 per share for the increase of capital stock.

The defence cannot prevail that payment for the stock was made by note and not in cash as required by G. L. c. 172, § 18. It is not necessary to determine the respective rights and liabilities between the trust company and the stockholder in these circumstances, provided the former had continued in business and were not in liquidation. The stock was subscribed for and the certificate was issued and dividends have been received and retained. The stockholders of record on the books of the corporation cannot now escape liability on such a ground. This point is covered by *Farmers & Mechanics Bank* v. *Jenks*, 7 Met. 592, where a note given for stock in a bank was upheld in an action on it by the receiver, although Rev. Sts. c. 36, § 4, St. 1836, c. 124, § 3, St. 1837, c. 108, required at least one half the stock to be paid in gold or silver coin. *Pine River Bank* v. *Hodsdon*, 46 N. H. 114. As was said in *Bearse* v. *Mabie*, 198 Mass. 451, 456, "It may be that the State could institute proceedings to avoid such stock; but the parties cannot set up their failure to comply with the statutory requirements to escape the result of what they did when they had a right to do what they did by complying with the statute."

The master's finding that Rachael E. Hailparn was the owner of sixty shares of stock cannot be reversed. The credibility of witnesses testifying orally was for him to determine. He was not bound by the descriptive terms in the certificate and was warranted in finding that the gift from her husband to her was absolute and that the addition of the statement that she held as trustee for minor children was unfounded in fact.

The findings of the master that Ida P. Mitchell, although a stockholder of record in the trust company, never purchased nor subscribed for the shares, never knew of the existence of the certificate in her name, and never received dividends, exonerate her from liability as a stockholder. *Williams* v. *Vreeland*, 250 U. S. 295, 299, 300.

On the findings of the master, the claim for stockholders' liability against the administrator of the estate of Harry

Gordon is barred by the short statute of limitations. *Coyle v. Taunton Safe Deposit & Trust Co.* 216 Mass. 156, 163. Gordon was alive at the time possession was taken of the property of the trust company, and hence the primary claim was against him personally and not directly and originally against his estate. See in this connection *Commissioner of Banks* v. *Hanover Trust Co.* 247 Mass. 347, 351.

It is too plain for discussion that the stockholders who received their certificates as gifts, even though in one instance for the benefit of some one else, must be held liable as stockholders on the principles already stated.

It is alleged in the bill that Charles Baker, one of the defendants, is a resident of New York. The master has found that no service was made on him, but that a valid attachment was made of his property and that he is the owner of ten shares of the original issue of capital stock and of twenty shares of the issue of the increase of capital stock. He has not appeared in the case. No general decree can be entered against him, but he is to be adjudged a stockholder and his liability established as such, to be enforceable only out of the property attached. *Cheshire National Bank* v. *Jaynes,* 224 Mass. 14.

It is not necessary to discuss the facts concerning other individual stockholders. They all are covered by what has been said.

All the points open on this record have been ably argued. They have all been carefully considered. But it is not necessary to deal with them in further detail.

The commissioner of banks on October 31, 1921, sent to each of the defendants a notice setting out the fact that he had determined that it was necessary to enforce the individual liability of the stockholders of the trust company to the extent of one hundred per cent. of the par value of the stock and demanding payment. The amount due from each defendant therefore bears interest from that date. In this respect our law follows that established with reference to the national bank act. *Bowden* v. *Johnson,* 107 U. S. 251, 263. *Casey* v. *Galli,* 94 U. S. 673. *Davis* v. *Watkins,* 56 Neb. 288.

The conclusion is that the master's main and supplemental

reports are to be confirmed, after sustaining such exceptions as relate to his inference that the forty-one proxies were voted at the stockholders' meeting of June 16, 1919, and a final decree is to be entered in general for the plaintiff against all the stockholders except as herein otherwise determined, all in conformity to this opinion. The details are to be settled by a single justice.

*Ordered accordingly.*